**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**JOHN VANDERKAM and
GAYLYN DIERINGER**,

Plaintiffs,

v.

**PENSION BENEFIT GUARANTY
CORPORATION and
MELISSA VANDERKAM**,

Defendants.

Civil Action No. 09-cv-1907 (RLW)

---

<u>**MEMORANDUM OPINION**</u>

Upon his retirement from the Huffy Corporation in August 1994, John VanderKam began receiving benefits under the Huffy Corporation Retirement Plan in the form of a Joint and 100% Survivor Annuity. At that time, John was married to Melissa VanderKam, whom he had designated as the survivor beneficiary under the Plan. John and Melissa divorced eight years later, and, after remarrying Gaylyn Dieringer in February 2003, John sought to substitute Gaylyn as the survivor beneficiary under his retirement plan through a Domestic Relations Order ("DRO") entered by a Texas state court.[1] The Plan initially approved the DRO as a Qualified Domestic Relations Order ("QDRO") and substituted Gaylyn as an alternate survivor beneficiary. In 2005, however, the Pension Benefit Guaranty Corporation ("PBGC") became statutory trustee of the Plan, and in the course of reviewing John's benefit payments, PBGC determined that Gaylyn's purported substitution as an alternate beneficiary was invalid and that Melissa remained the survivor beneficiary under the Plan.

---

[1] For ease of reference, and because John and Melissa share the same last name, the Court refers to John, Melissa, and Gaylyn by their first names.

Through this action, John and Gaylyn (collectively, "Plaintiffs") seek reversal of PBGC's determination under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), arguing that PBGC's decision was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq*. Alternatively, Plaintiffs argue that, even if the Court upholds PBGC's decision, the Court should impose a constructive trust under Texas common law on any survivor benefits received by Melissa under the Plan.  In response to Plaintiffs' summary judgment motion, both PBGC and Melissa have cross-moved for summary judgment, urging the Court, respectively, to uphold PBGC's determination and to reject Plaintiffs' alternative claims for relief.

Upon careful consideration of the parties' briefing and a thorough review of the Administrative Record, and based on the arguments of counsel during the hearing on April 29, 2013, the Court concludes that PBGC's decision is both reasonable and reasonably explained, and the Court also finds that Plaintiffs' claims against Melissa under Texas state common law are preempted by ERISA's statutory scheme.  As a result, and for the reasons more fully set forth herein, the Court will **DENY** Plaintiffs' Motion for Summary Judgment (Dkt. No. 43), and will **GRANT** PBGC's and Melissa's Cross-Motions for Summary Judgment (Dkt. Nos. 46, 47).

## BACKGROUND

On August 1, 1994, John retired from his employment with the Huffy Corporation. (Administrative Record ("AR") 34).  Through his position with Huffy, John was a participant in the Huffy Corporation Retirement Plan (the "Plan"), and, prior to his retirement, he elected to receive his Plan benefit as a joint-and-100%-survivor annuity and designated his then-wife, Melissa, as the survivor beneficiary.  (AR 34-36).  This benefit is a considered a "Qualified Joint

and Survivor Annuity" ("QJSA") for purposes of ERISA and the Internal Revenue Code. *See* 29 U.S.C. § 1055(a)(1).[2]  Upon retirement, John began receiving payouts under the Plan.

John and Melissa divorced approximately eight years later, in March 2002, and a final decree of divorce was entered in Texas state court.  (AR 232).  Pursuant to this decree, John was awarded "as his sole and separate property" all rights "related to any . . . pension plan . . . existing by reason of [his] past, present, or future employment."  (AR 250).

In March 2003, John married Gaylyn, and he sought to designate Gaylyn as an alternate payee for the survivor benefits under the Plan.  To this end, John petitioned a Texas state court for a DRO—the substance of which had been drafted by the Plan's legal counsel.  (AR 24-26, 274).  Melissa objected to and opposed John's efforts in those proceedings, arguing that she did not disclaim any interest in the Plan as part of the prior divorce decree.  The Texas court ultimately approved the DRO, concluding that Melissa "waived her entitlement to the survivor annuity" as part of the divorce decree; that the divorce decree "divested [Melissa] of all interest and rights to [John's] Retirement Benefit with the Huffy Corporation, including specifically the survivor annuity portion of the Retirement Benefit"; and that John "wishes to designate a beneficiary with respect to the survivor annuity portion of the Retirement Benefit."  (AR 24).  The DRO proceeded to name Gaylyn as an alternative payee, explaining that she "is entitled to

---

[2]      As the Ninth Circuit has succinctly explained:

ERISA provides for two types of survivor annuity benefits.  If a vested participant dies before the annuity start date and the participant is survived by a spouse, the surviving spouse is entitled to a qualified preretirement survivor annuity ("QPSA") . . . . QJSA benefits arise when the participant does not die before the annuity start date.  These benefits are payable to the plan participant for his lifetime after the annuity start date and, if the plan participant dies before his spouse, the surviving spouse will receive no less than 50 percent of the amount of the annuity for the remainder of her lifetime.

*Carmona v. Carmona*, 603 F.3d 1041 1053 (9th Cir. 2010) (amended opinion).  Here, because John did not die prior to the annuity starting date—i.e., his retirement from Huffy—the applicable benefit is a QJSA.

the survivor annuity portion of the Retirement Plan distribution in accordance with the provisions of the Plan. The survivor annuity portion of the Retirement Benefit remains unchanged and is calculated based upon the life expectancies of [John] and [Melissa]." (AR 24).

The Plan's legal counsel determined that the DRO issued by the Texas state court was a valid QDRO for purposes of ERISA, and the Plan administrator thus designated Gaylyn as an alternate payee with respect to the survivor benefits in August 2003. (AR 43).

In August 2005, the Plan terminated, at which time PBGC became its statutory trustee.[3] Around that time, it appears that PBGC reduced the amount of John's monthly benefit payment, and John subsequently requested a review of his benefit payments by letter dated February 15, 2006. (AR 360). Ultimately, PBGC completed its review of John's benefits and notified him of its determination in September 2008. (AR 277-283). PBGC increased John's monthly benefit payment from $2,839.45 to $4,317.09, but in the course of examining John's file, PBGC also determined that Melissa, and not Gaylyn, was the proper beneficiary for the survivor annuity

---

[3]    PBGC serves a unique and important role in ensuring the integrity of pension plan benefits in the United States. As the Supreme Court has explained:

> PBGC is a wholly owned United States Government corporation, modeled after the Federal Deposit Insurance Corporation . . . . The PBGC administers and enforces Title IV of ERISA. Title IV includes a mandatory government insurance program that protects the pension benefits of over 30 million private-sector American workers who participate in plans covered by the Title. In enacting Title IV, Congress sought to ensure that employees and their beneficiaries would not be completely deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.
>
> When a plan covered under Title IV terminates with insufficient assets to satisfy its pension obligations to the employees, the PBGC becomes trustee of the plan, taking over the plan's assets and liabilities. The PBGC then uses the plan's assets to cover what it can of the benefit obligations. The PBGC must then add its own funds to ensure payment of the most of the remaining "nonforfeitable" benefits, i.e., those benefits to which participants have earned entitlement under the plan terms as of the date of termination.

*PBGC v. LTV Corp.*, 496 U.S. 633, 636-38 (1990) (internal citations and quotation marks omitted).

benefits under the Plan.  (AR 277-283).  John contacted PBGC seeking clarification on this

beneficiary determination, and PBGC responded via letter on December 11, 2008, explaining:

> PBGC policy is as follows: The survivor annuity that becomes payable under this
> policy to a surviving spouse will only be paid to the spouse if he or she was
> married to the participant on the participant's annuity starting date.   The
> participant's spouse continues to be entitled to the survivor annuity even if the
> participant and that spouse are not married on the date of the participant's death.
> A participant may designate any living person as the beneficiary of an optional
> joint-life annuity form.   The beneficiary may not be changed after the first
> payment date.

(AR 284).[4]   In February 2009, John formally requested an "initial determination" from PBGC,

under 29 C.F.R. §§ 4003.21 and 4003.51, "concerning its change to [his] beneficiary designation

for the survivor portion of his annuity retirement benefits."  (AR 287-290).  PBGC responded via

letter on February 26, 2009, advising John as follows:

> As mentioned in our previous letter dated 12/11/2008, PBGC is unable to change
> the designation of beneficiary made by the Participant.   At the time of the
> participant's retirement which was 08/01/1994, he elected a Joint and 100%
> Survivor Annuity with Melissa VanderKam.
>
> A spousal waiver can only occur at the participant's date of retirement in order to
> be a valid waiver.  Once the benefit election is implemented, it cannot be changed
> or waived after the first payment has been made.  Therefore, the Divorce Decree
> dated 03/15/2002, the Order for Clarification and Modification dated 7/30/2003,
> all of which are dated after the participant's date of retirement have no affect [sic]
> on Melissa VanderKam's entitlement and eventual receipt of the survivor annuity.

(AR 310-311).

---

[4]      PBGC's reasoning at that time is further elucidated by an internal "Service Request
Details" form, which summarizes the history as follows:

> A letter dated 12/11/2008 was sent to [John VanderKam] explaining that his designation
> of beneficiary was made at the time of his election and being put into pay.  He elected his
> ex wife Melissa as beneficiary on J&S 100% survivor annuity.  His benefit calculation
> was based on the ages of both of them and according to the provisions of the plan cannot
> be changed after he goes into pay.  He has been in pay for several years and this election
> cannot be rescinded by any divorce decree, Order on Motion of Clarification or QDRO.
> The initial election must be upheld by PBGC . . . .

(AR 285-286).

John and Gaylyn then initiated this lawsuit against PBGC on October 7, 2009.  (Dkt. No. 1).  About two months later, on December 18, 2009, PBGC formally responded to John's request for an "initial determination," advising that although it "initially declined to issue such a determination, . . . upon further consideration, PBGC has decided that your request for issuance of a determination is reasonable." (AR 27-33).  Therein, PBGC explained its conclusion that the domestic relations order issued by the Texas state court did not constitute a valid QDRO under ERISA, and that Melissa's purported waiver and disclaimer of the survivor annuity benefit under the Plan was ineffective.  (AR 27-33).  This action was then stayed while Plaintiffs exhausted their administrative remedies with PBGC, (*see* Dkt. Nos. 7, 8), until the PBGC Appeals Board ultimately upheld the initial determination in a letter dated November 24, 2010, (AR 2-22).  Plaintiffs then filed a First Amended Complaint, (Dkt. No. 10), and PBGC moved to join Melissa as a required party under Federal Rule of Civil Procedure 19, (Dkt. No. 20).  The Court granted PBGC's motion on February 7, 2012, (Dkt. No. 30), and Plaintiffs then filed a Second Amended Complaint adding Melissa as a defendant on February 21, 2012, (Dkt. No. 32).

Through their Second Amended Complaint, Plaintiffs challenge and seek reversal of the PBGC Appeals Board's determination pursuant to 29 U.S.C. § 1303(f)(1) (*Count I*), and they also allege that the Appeals Board's determination violates ERISA's "anti-cutback rule," 29 U.S.C. § 1054(g) (*Count II*).  In addition, Plaintiffs assert a number of claims against Melissa under Texas state common law: a claim seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that John has equitable title to the survivor annuity benefits under the Plan (*Count III*); a claim for unjust enrichment, asking the Court to impose a constructive trust on any survivor benefits received by Melissa under the Plan (*Count IV*); and a claim for anticipatory breach of contract (*Count V*).  The parties settled on a briefing schedule for cross-motions for summary

judgment, and the Court subsequently heard arguments from the parties during a hearing on April 29, 2013, at which time it took the matter under advisement.

## <u>ANALYSIS</u>

This action presents two distinct sets of issues for the Court's review.  First, the Court must consider Plaintiffs' challenge to the PBGC Appeals Board's decision, determining whether the Appeals Board reasonably and appropriately concluded that Melissa, and not Gaylyn, remains the proper beneficiary of the survivor annuity benefits under the Plan, based on ERISA's statutory framework and the terms of the Plan itself.  Second, if the Court upholds the Appeals Board's determination, the Court must consider whether it can and should impose a constructive trust, under Texas common law, over any benefits received by Melissa pursuant to the Plan.  The Court takes each of these issues in turn.

### A.  The PBGC Appeals Board's Determination

Several aspects of the Appeals Board's decision are implicated by Plaintiffs' claims. First, Plaintiffs challenge PBGC's determination that the DRO they obtained is not a valid QDRO because it would provide a "type of form of benefit . . . not otherwise provided under the plan," in contravention of ERISA section 206(d)(3)(D)(i).  *See* 29 U.S.C. § 1056(d)(3)(D)(i). Second, Plaintiffs challenge PBGC's conclusion that Melissa could not have waived her survivor benefit through a QDRO, in any event, because her survivor benefits irrevocably vested upon the annuity starting date and therefore could not be divested through a subsequent DRO.  While PBGC addressed these issues in this sequence—and while the parties' briefing largely adheres to the same structure—the Court believes it more appropriate to first resolve the issue of whether Melissa's survivor benefits were vested (and, consequently, not waivable or assignable), before turning to analyze whether the DRO issued by the Texas state court was a valid QDRO.  Finally,

7

the Court considers Plaintiffs' argument that PBGC waived the ability to contest the validity of the QDRO and/or the substitution of Gaylyn as the survivor annuity beneficiary, given the Plan administrator's initial approval of the DRO as a valid QDRO before PBGC became statutory trustee of the Plan.

### 1.  Standard of Review

Pursuant to its authority as statutory trustee, PBGC is responsible for administering benefits under terminated pension plans, which includes the authority and duty to make determinations with respect to the plan participants' benefits.  *See* 29 U.S.C. § 1342(d)(1)(B). Participants may then challenge such determinations before the PBGC Appeals Board, *see* 29 C.F.R. §§ 4003.21, 4003.51, and "[t]he decision of the Appeals Board constitutes the final agency action by the PBGC with respect to the determination which was the subject of the appeal," *id.* § 4003.59(b).  Decisions of the Appeals Board are then subject to review under the APA.  *See LTV Corp.*, 496 U.S. at 636, 656; *Davis v. PBGC*, 864 F. Supp. 2d 148, 155 (D.D.C. 2012); *United Steel v. PBGC*, 839 F. Supp. 2d 232, 241 (D.D.C. 2012); *Air Line Pilots Ass'n v. PBGC*, 193 F. Supp. 2d 209, 220-21 (D.D.C. 2002).

Under the APA, a court must set aside agency action as unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2). The Court notes that both Plaintiffs and PBGC agree that the APA's "arbitrary and capricious" standard applies to the Court's review of PBGC's decision in this case.  (Dkt. No. 43 ("Pls.' Mem.") at 12; Dkt. No. 47 ("PBGC Mem.") at 10-12).[5]  The "arbitrary and capricious" standard

---

[5]      At oral argument, however, counsel for Plaintiffs suggested otherwise and argued that a *de novo* standard of review applies as to some issues presented in this case, citing as support the following cases: *Dycus v. PBGC*, 133 F.3d 1367 (10th Cir. 1998); *Burgin v. OPM*, 120 F.3d 494 (4th Cir. 1997); and *Air Line Pilots Ass'n*, 193 F. Supp. 2d 209.  But these decisions do not dictate that a *de novo* standard governs the review of a PBGC Appeals Board decision, as the

of review is a narrow one, and it is well settled that "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   The Court must be satisfied that the agency "examine[d] the relevant [issues] and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."   *Id.*; *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036 (D.C. Cir. 2012).   While a reviewing court must conduct a "searching and careful" review, the agency's action remains "entitled to a presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and the Court "will not second guess an agency decision or question whether the decision made was the best one," *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991).   The Court must uphold PBGC's decision "so long as the agency 'engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record.'"   *Clark County v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting *N.Y. Cross Harbor R.R. v. STB*, 374 F.3d 1177, 1181 (D.C. Cir. 2004)).

### 2.   PBGC's Finding That Melissa Did Not Waive Her QJSA Benefit And Could Not Transfer Her Survivor Benefit Interest To Gaylyn Through A QDRO

In its decision, the PBGC Appeals Board determined that the DRO issued by the Texas court could not divest Melissa's survivor annuity benefit because her rights irrevocably vested upon the annuity starting date.   (AR 13-18).   For the same reasons, the Appeals Board also

---

Court undertakes here; at most, these cases stand for the proposition that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (cited with approval in *Dycus*, 133 F.3d at 1369).   And Plaintiffs concede that, for purposes of this case, "the Plan gives the Plan Administrator discretion to construe and interpret the Plan's terms." (Pls.' Mem. at 12).   Moreover, *Burgin* did not even involve claims under ERISA or the actions of PBGC, *see generally* 120 F.3d 494, and in *Air Line Pilots Ass'n*, the court did not raise the issue of *de novo* review whatsoever and actually applied the APA's arbitrary and capricious standard to the PBGC decision at issue, *see* 193 F. Supp. 2d at 220.

rejected Plaintiffs' arguments that Melissa had waived her right to the survivor annuity benefit, whether through the decree of divorce or the domestic relations order. While PBGC analyzed these issues separately—both in the Appeals Board's decision and through its briefing in this case—in the Court's view, the two issues turn on the same legal principles for purposes of this decision and will therefore be analyzed together.[6]

As PBGC explains, the Appeals Board reached its determination by relying upon decisions from the Fourth, Fifth, and Ninth Circuits, all of which "have found that a survivor benefit irrevocably vests in the beneficiary at the [annuity starting date] and cannot be reassigned thereafter by a [domestic relations order]." (PBCG Mem. at 12). *See Carmona*, 603 F.3d at 1048 ("[W]e hold that QJSA surviving spouse benefits irrevocably vest in the participant's spouse at the time of the annuity start date . . . and may not be reassigned to a subsequent spouse."); *Rivers v. Cent. & S.W. Corp.*, 186 F.3d 681, 683 (5th Cir. 1999) (holding that participant's "pension benefits irrevocably vested in [his then-spouse] on the date of his retirement and [his subsequent spouse] is forever barred from acquiring an interest in [his] pension plan"); *Hopkins v. AT&T Global Info. Solutions Co.*, 105 F.3d 153, 156 (4th Cir. 1997) ("Surviving [s]pouse [b]enefits vest in the spouse married to the participant on the date of retirement."). Given the significant precedential weight afforded to these decisions by PBGC, the Court summarizes each case in some detail.

---

[6]      In fact, PBGC described the interconnectedness of the two questions itself in the Appeals Board decision: "PBGC's determination stated that the DRO cannot be a QDRO because it impermissibly 'attempts to divest Melissa of her statutory right to the survivor benefit after that right had already vested.' You disagree, asserting that Melissa validly had waived her statutory rights to the survivor benefit in the Divorce Order." (AR 13). That said, the Court recognizes that Plaintiffs parse out the issues analytically to some extent—asserting that Melissa's purported waiver of the benefits through the divorce decree opened the door for the subsequent DRO that ostensibly assigned the survivor benefit to Melissa. But since PBGC's rejection of these arguments turned on the same analysis, the Court considers the issues together.

First, in *Hopkins*, the Fourth Circuit, describing the question as one of "first impression in the federal courts," considered whether an ERISA plan participant's former wife was entitled to surviving spouse benefits based on a DRO issued by a West Virginia court *after* the plan participant's remarriage to his second wife and subsequent retirement date.  105 F.3d at 154-155. After closely examining ERISA's statutory framework, the court answered the question in the negative, concluding that "[s]urviving [s]pouse [b]enefits vest in the participant's current spouse on the date the participant retires."  *Id.* at 156.  In so holding, the Fourth Circuit placed particular emphasis on Congress' enactment of the Retirement Equity Act ("REA"), which amended ERISA's requirement that, to qualify for surviving spouse benefits, a spouse must be married to a participant both at the time of the participant's retirement and at the time of the participant's death.  *Id.*  Upon passage of the REA, Congress did away with the latter criterion, such that surviving spouse benefits may now "be paid to a spouse who was married to the participant on the date of the participant's retirement, regardless of whether that spouse is married to the participant on the date of the participant's death."  *Id.*[7]  The court also emphasized that the REA "makes it more difficult to replace a joint and survivor annuity—along with its [s]urviving [s]pouse [b]enefits," given that such a change can only be accomplished "during the ninety-day period prior to retirement, and only with the written consent of the participant's current spouse." *Id.* at 156-57.

For all these reasons, the Fourth Circuit held that the appellant's DRO did not entitle her to the surviving spouse benefits because those benefits had vested in the participant's second

---

[7]     These changes did not render the statute without some limitations, however.  Even after the passage of the REA, ERISA still requires that the spouse seeking survivor benefits either must have been married to the participant for at least one year prior to the participant's retirement, or must have been married to the participant prior to retirement and for at least a one-year period prior to the participant's death.  29 U.S.C. § 1055(f).

wife upon his retirement.  *Id.* at 157.  Two years later, the Fifth Circuit was confronted with a

nearly-identical set of circumstances in *Rivers* and expressly adopted the Fourth Circuit's

rationale in *Hopkins*.  *Rivers*, 186 F.3d at 683-84.  More specifically, the *Rivers* court held that

the surviving spouse benefits at issue had irrevocably vested in the plan participant's second wife

at the time of his retirement and therefore could not be assigned to his first wife through a DRO:

> This Circuit agrees with the Fourth Circuit's decision in *Hopkins* and adopts its
> rationale.  Rivers failed to protect her rights in Franklin's pension plan by
> neglecting to obtain a QDRO prior to Franklin's retirement date.  Consequently,
> Franklin's pension benefits irrevocably vested in Mrs. Franklin on the date of his
> retirement and Rivers is forever barred from acquiring an interest in Franklin's
> pension plan.

*Id.*

Recently, the Ninth Circuit was presented with a situation even more analogous to the

claims pressed by Plaintiffs in this case.  *See Carmona*, 603 F.3d 1041.  The salient facts of

*Carmona* revolved around the QJSA benefits of Lupe Carmona under two separate pension plans

and the ensuing litigation between Janis Carmona and Judy Carmona—Lupe's eighth and ninth

wives, respectively—as to who was entitled to the survivor annuity portion of those benefits

upon Lupe's death.  *Id.* at 1048-50.  Lupe had married Janis in 1988, and, while they were

married, he designated Janis as his survivor beneficiary under the applicable plans.  *Id.* at 1048.

Lupe then retired in 1992 and began receiving payments under the pension plans.  *Id.*  In 1994,

Lupe and Janis commenced divorce proceedings, through which Lupe sought to remove Janis as

the survivor beneficiary; the Nevada state family court ultimately granted Lupe both pensions

"as his sole and separate property."  *Id.*  Three years later, in 1997, Lupe married Judy and

petitioned the Nevada family court for a QDRO revoking Janis' designation as the survivor

beneficiary, and substituting Judy in her place.  *Id.* at 1049.  Lupe died in 1999, survived by both

Janis and Judy, and the Nevada court ordered the plan administrators to change the survivor

beneficiary from Janis to Judy, or, alternatively, ordered that any funds received by Janis under the plans be placed in a constructive trust with Judy as the beneficiary.  *Id.*  Janis appealed the decision, and the Nevada Supreme Court affirmed.  *Id.*  Janis then initiated a federal lawsuit against Judy and the pension plans under 29 U.S.C. § 1132(a)(3), and one of the pension plans cross-claimed against Judy for declaratory relief.  *Carmona*, 603 F.3d at 1049.  The district court dismissed Judy's claims under the *Rooker-Feldman* doctrine and rejected the pension plan's claims on the merits, "conclud[ing] that ERISA does not preclude a state court from issuing a QDRO substituting an alternate payee for a surviving spouse after a plan participant's retirement."  *Id.* at 1050.

On appeal, the Ninth Circuit affirmed the dismissal of Judy's claims on *Rooker-Feldman* grounds, but it reversed the district court's holding as to the substitution of surviving spouse beneficiaries: "[W]e hold that QJSA surviving spouse benefits irrevocably vest in the participant's spouse at the time of the annuity start date—in this case the participant's retirement—and may not be reassigned to a subsequent spouse."  *Id.* at 1047.  In reaching this conclusion, the court relied substantially on the Fourth Circuit's decision in *Hopkins*, and was "persuaded by the structure and purpose of ERISA that the rule enunciated in *Hopkins* is the proper rule for QJSA benefits."  *Id.* at 1057.  The court then specifically outlined several bases for its conclusion.  First, the court found significant ERISA's statutory restrictions allowing the participant and spouse to opt out of a QJSA benefit only during the limited election period:

> It is difficult to see how courts may reassign QJSA surviving spouse benefits at any time given the fact that the statutory scheme so diligently and strictly protects the interests of the participant's spouse at the time of the participant's retirement by establishing that the only way to avoid QJSA survivor benefits is by opting out in writing *before the retirement date*.

*Id.* at 1057 n.10 (emphasis in original).  Second, the Ninth Circuit was convinced, as the Fourth Circuit had been, that the amendments enacted through the REA supported such a result:

> The fact that the REA establishes that surviving spouse benefits may now be paid to a spouse who is married on the day of the participant's retirement, regardless of whether the participant and spouse are married at the participant's death, suggests that the retirement date is the crucial date for establishing the rights of the surviving spouse. Following this reasoning, we conclude that once a participant retires, the spouse at the time becomes the "surviving spouse" entitled to the QJSA benefits.

*Id.* at 1057-58. Third, the court believed "that the ultimate objectives of Congress are served by recognizing the rule that a QDRO may not reassign surviving spouse benefits after a plan participant had retired," noting that ERISA's surviving spouse benefits were designed, in part, "to ensure a stream of income to surviving spouses." *Id.* at 1058 (quoting *Boggs v. Boggs*, 520 U.S. 833, 843 (1997)). Finally, the court concluded that "a vesting rule also promotes one of the principal goals underlying ERISA: ensuring that plans be uniform in their interpretation and simple in their application." *Id.* at 1059 (internal citation and quotation marks omitted). For all of these reasons, the Ninth Circuit summed up its decision as follows: "Because the retirement of a plan participant ordinarily creates a vested interest in the surviving spouse at the time of the participant's retirement, we conclude that a DRO issued after the participant's retirement may not alter or assign the surviving spouse's interest to a subsequent spouse." *Id.* at 1059-60.

With these decisions firmly in mind, the Court turns back to the circumstances of the case at bar. Based on the reasoning of these cases—principally the Ninth Circuit's analysis in *Carmona*—the Appeals Board concluded that Melissa did not waive her right to the survivor annuity benefit and resolved that, even if "Melissa had the authority to disclaim the Plan's survivor benefit, that benefit cannot be reassigned to Gaylyn through a QDRO." (AR 13-18). Because John was married to Melissa at the time of his retirement, and because John and Melissa did not elect to waive the QJSA benefit or elect another benefit option within the 90-day window under applicable provisions of the Plan and ERISA, PBGC concluded that the survivor annuity benefit irrevocably vested in Melissa at the time of John's retirement. Consequently, PBGC

determined that Melissa did not subsequently waive the survivor benefit or assign the benefit to Gaylyn, whether through the divorce decree or the DRO later entered by the Texas court.  In view of the thorough explication that PBGC offered for its determination—including the detailed discussion and application of the above-described cases to the issues presented in Plaintiffs' appeal—the Court finds that PBGC's decision was based upon reasoned decisionmaking and is rationally supported by the record and by applicable law.[8]

None of Plaintiffs' arguments compels any contrary conclusion.  To begin with, the Court notes that Plaintiffs failed to include so much as a passing reference to *Carmona*, *Rivers*, or *Hopkins* in their opening brief.  This approach is telling.  Indeed, it is not until Plaintiffs' responsive brief that they even attempt to distinguish and diffuse the impact of these decisions, but, even then, their efforts are unavailing and half-hearted at best.  In essence, Plaintiffs brush aside the careful analysis of the Fourth, Fifth, and Ninth Circuits because, in their view, "neither Congress nor the Plan intended survivor benefits to vest in a spouse at all."  (Pls.' Reply at 8).  According to Plaintiffs, these decisions improperly "inferred that the ASD is the point at which the surviving spouse benefits vest in the participant's spouse" and "did not consider ERISA's nonforfeitability provisions."  (Pls.' Reply at 9-10).  Plaintiffs alternatively argue that, "[e]ven if Congress intended for survivor benefits to vest in a spouse, it plainly did not intend for those benefits to vest unless and until the spouse actually survived the participant."

---

[8]    It also bears noting that, in addition to the decisions discussed above, courts in other jurisdictions have similarly concluded that a surviving spouse's benefits vest upon the plan participant's retirement and cannot thereafter be divested, altered, or assigned.  *See, e.g.*, *Anderson v. Marshall*, 856 F. Supp. 604, 607 (D. Kan. 1994); *Montgomery v. AGC-Int'l Union of Operating Eng'rs Local 701 Pension Trust Fund*, 2010 WL 1406566 (D. Ore. Apr. 5, 2010); *Walsh v. Woods*, 638 S.E. 2d. 85, 90-91 (S.C. Ct. App. 2006).  *But see Torres v. Torres*, 60 P.3d 798 (Haw. 2003) (holding that surviving spouse benefits did not vest in the then-current spouse upon the participant's retirement).

These arguments miss the mark in several respects.  As PBGC points out, Plaintiffs' nonforfeitability theory seems to "conflate[] the concepts of a nonforfeitable *claim* to a survivor benefit and a benefit *payment*."  (Dkt. No. 57 ("PBGC Reply") at 3-4) (emphasis in original).  ERISA's definition of "nonforfeitable" refers to "a *claim* obtained by a participant or his beneficiary to that part of an immediate or deferred benefit," and not to the payment of any such benefit, as Plaintiffs' theory presupposes.  29 U.S.C. § 1002(19); *Nachman Corp. v. PBGC*, 446 U.S. 359, 371 (1980) ("[I]t is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.").  Thus, even if Melissa's right to *payment* of the survivor annuity benefit under the Plan did not become "nonforfeitable" until John predeceases her, as Plaintiffs suggest, this would in no way dislodge Melissa's irrevocable right to a *claim* for the survivor benefit, which vested upon John's retirement.  Perhaps more significantly, however, even if the Court were to credit Plaintiffs' interpretation as reasonable, this conclusion would not render PBGC's contrary interpretation unreasonable, which is, of course, the hurdle Plaintiffs must clear to establish that the Appeals Board's decision was "arbitrary and capricious."  Simply stated, Plaintiffs fail to demonstrate that PBGC's decision, which was based on directly analogous holdings from three separate Courts of Appeals, fails to evidence a "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43.[9]

---

[9]    It also appears that Plaintiffs never advanced this particular line of attack before the Appeals Board, which means that they may well have waived the argument altogether.  *See, e.g.*, *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297-98 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.").  However, since PBGC does not urge such a result—and since the Ninth Circuit's amended opinion in *Carmona* postdated Plaintiffs' appeal letter—the Court will not deem the issues waived.  Of course, *Carmona* aside, Plaintiffs' nonforfeitability argument could have been mounted just as easily against the *Hopkins* and *Price* decisions, which were longstanding precedent at the time of Plaintiffs' appeal.  To the

The Court dispatches with Plaintiffs' remaining arguments on this issue in relatively short order.  First, the Court rejects the notion that the Supreme Court's decision in *Kennedy* dictates reversal of the Appeals Board's decision.  Plaintiffs repeatedly cite *Kennedy* for the proposition that "the law certainly is not so absurd to force a man to take an estate against his will."  (*See, e.g.*, Pls.' Mem. at 15; Pls.' PBGC Reply at 12).  While true, this principle finds no application in the present case.  At its core, *Kennedy* simply held that ERISA's antialienation provision, 29 U.S.C. § 1056(d)(1), does not render all waivers of plan benefits null and void—as the above-quoted language illustrates; instead, the Court reiterated the so-called "plan documents rule," explaining that, to be valid, a waiver must adhere to ERISA's other statutory requirements and the governing procedures and terms of the plan.  *Kennedy*, 555 U.S. at 299-304.  Put another way, "[a]s the Supreme Court made clear in *Kennedy*, ERISA's antialienation provision does not prohibit a surviving spouse beneficiary from waiving his or her interest in plan benefits, but such a waiver must also conform to plan procedures and instruments."  *Carmona*, 603 F.3d at 1060. Here, it is undisputed that Melissa did not waive her surviving spouse benefits in accordance with the Plan's terms; John and Melissa never executed a waiver within the 90-day election period preceding his retirement—in fact, John expressly elected otherwise, clearly and affirmatively designating Melissa as the survivor beneficiary in the months leading up to his retirement.  (AR 34-36).  Consequently, PBGC correctly and reasonably determined that the "holding in *Kennedy* does not dictate how the Appeals Board must decide the VanderKam appeals."  (AR 14).

---

extent that Plaintiffs thought that those courts got it wrong, they could and should have raised this argument with the PBGC Appeals Board.  But at the administrative level, Plaintiffs argued only that the relevant holding in the original *Carmona* opinion was abrogated by the Supreme Court's decision in *Kennedy v. Plan Administrator for DuPont Savings and Investment Plan*, 555 U.S. 285 (2009), without any mention of *Hopkins* or *Price*, let alone that those decisions wrongly failed to account for ERISA's "nonforfeitability provisions."  (*See* AR 312-317, 354-355).

17

Similarly, Plaintiffs' reliance on Treasury Regulation 1.401(a) fails to advance their position. This particular portion of the regulations provides as follows:

> If a participant dies after the annuity starting date, the spouse to whom the participant was married on the annuity starting date is entitled to the QJSA protection under the plan. The spouse is entitled to this protection (unless waived and consented to by such spouse) even if the participant and spouse are not married on the date of the participant's death, *except as provided in a QDRO.*

26 C.F.R. § 1.401(a)-20, Q&A-25(b)(3) (emphasis added). Plaintiffs seize on the italicized language to support the unremarkable and unassailable proposition that "Congress intended that QDROs could alter QJSA benefits." (Pls.' PBGC Reply at 6). But what Plaintiffs overlook is that this principle is entirely consistent with the holdings of *Carmona*, *Hopkins*, and *Price*, and, in turn, the decision of the Appeals Board in this case. A valid QDRO can, of course, alter or substitute the beneficiary of surviving spouse benefits, so long as the QDRO is secured *prior to the participant's retirement* and the resultant vesting of those benefits in the participant's then-current spouse. To the extent that Plaintiffs suggest that a QDRO must be recognized as valid regardless of whether it was obtained before or after the participant's retirement—essentially trumping the vesting date of surviving spouse benefits—the Court rejects this premise, both because it runs directly counter to the holdings of the Fourth, Fifth, and Ninth Circuits, and because Plaintiffs provides no contrary authority to support their position.

Finally, the Court is unpersuaded by the string-cite of cases Plaintiffs proffer for the proposition that "[f]ederal courts have long held that language in parties' divorce decrees can serve as federal common-law waivers of their rights to ERISA-plan benefits." (Pls.' Mem. at 13-14). As PBGC points out, none of those cases considered whether a surviving spouse can waive QJSA benefits after the participant's retirement, or even concerned QJSA benefits whatsoever. *See Lyman Lumber Co. v. Hill*, 877 F.2d 692 (8th Cir. 1989) (analyzing profit-sharing plan); *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir. 1990)

(considering lump-sum death benefit); *Brandon v. Travelers Ins. Co.*, 18 F.3d 1321 (5th Cir. 1994) (evaluating life insurance proceeds); *Melton v. Melton*, 324 F.3d 941 (7th Cir. 2003) (same); *Clift v. Clift*, 210 F.3d 268 (5th Cir. 2000) (same).  Moreover, two of these decisions— *Fox Valley* and *Brandon*—were expressly abrogated by the Supreme Court's holding in *Kennedy* that a "federal common law waiver of plan benefits is [in]effective where that waiver is inconsistent with plan documents." *Kennedy*, 555 U.S. at 291-92 & n.5.  Instead, the Court finds PBGC's reliance on the *Carmona*, *Hopkins*, and *Price* decisions—which squarely wrestled with the unique statutory framework governing QJSA benefits, and which concluded that surviving spouse benefits vest upon the participant's retirement date—to be reasonable and amply supported by the Administrative Record in this matter.

### 3.  PBGC's Finding That The DRO Did Not Qualify As A Valid QDRO

The Appeals Board also found that Gaylyn could not be substituted as the beneficiary for the survivor annuity benefits for the separate and independent reason that the DRO issued by the Texas court did not qualify as a QDRO because it would have improperly required "the payment of a type of benefit not otherwise provided under the Plan's terms," in contravention of ERISA section 206(d)(3)(i).  (AR 11-13).  In reaching this conclusion, the Appeals Board recognized that the DRO did not "change either the total monthly amounts or the timing of the benefit payments that PBGC is required to make," given that the survivor benefit would only be paid to Gaylyn for the duration of Melissa's life.  (AR 11).  But in PBGC's view, these were not the only relevant considerations:

> Although the DRO does not change the amount and/or timing of the required payments, it changes the recipient of the payments.  If John dies before Melissa, the DRO would require PBGC to pay the survivor benefit to Gaylyn (rather than Melissa) for as long as Melissa lives.  *The Plan does not contain a provision under which a survivor benefit is paid to one beneficiary based on the remaining lifetime of another individual.*

(AR 12) (emphasis added). The Appeals Board also noted the additional administrative burdens the DRO would impose upon PBGC, explaining that it "would need to monitor whether or not Melissa remains alive (even though PBGC is not paying her benefits) because PBGC's payments to Gaylyn would end upon Melissa's death." (AR 12). PBGC's decision also pointed out the novel issue of what would occur if Gaylyn predeceases Melissa—"a contingency not addressed in the DRO." (AR 12). For these reasons, the Appeals Board concluded that the DRO issued by the Texas court could not be qualified as a QDRO for purposes of ERISA.[10]

Plaintiffs take issue with PBGC's conclusion, arguing that its "assertion is unfounded." (Pls.' Mem. at 17). In Plaintiffs' view, there is "nothing remarkable" about a DRO that changes the recipient of benefits, "as the purpose of a QDRO is to create or recognize an alternate payee's right to plan benefits." (*Id.*). They argue that because the survivor benefit is payable to Gaylyn for the life of Melissa, and because the amount of the benefit remains unchanged by the DRO, "the type of benefit the Texas Order directs the Plan to pay is indisputably a type of benefit the Plan provides." (Pls.' PBGC Reply at 3). Plaintiffs assert that the statutory requirement invoked by PBGC—ERISA section 206(d)(3)(i)—is limited in application to circumstances when a DRO "would require benefits to be paid in a specific manner or time frame that is not provided for in the terms of the plan." (*Id.* (quoting *Brown v. Cont'l Airlines*, 647 F.3d 221, 226-27 (5th Cir. 2011))). This, Plaintiffs urge, is not such a circumstance.

As this issue turns on a question of statutory interpretation, the familiar *Chevron* framework governs, yet both sides inexplicably fail to approach the argument from a *Chevron*

---

[10] In its "initial determination," PBGC also concluded that the DRO could not be qualified because it failed the "specificity" requirements of ERISA section 206(d)(3)(C)(ii), (iii). (AR 29-31). However, the Appeals Board expressly declined to reach this issue in its decision and it therefore did not serve as a basis for the final agency action under review. (AR 12 at n.5). Correspondingly, this Court need not and does not pass on the issue.

perspective.  *See Chevron, U.S.A., Inc. v. NDRC, Inc.*, 467 U.S. 837 (1984).  It is well settled that "PBGC generally receives *Chevron* deference for its authoritative interpretation of ambiguous provisions of ERISA."  *Davis v. PBGC*, 571 F.3d 1288, 1293 (D.C. Cir. 2009) (citing *LTV Corp.*, 496 U.S. at 651-52; *Mead Corp. v. Tilley*, 490 U.S. 714, 722 (1989)); *see also Page v. PBGC*, 968 F.2d 1310, 1315 (D.C. Cir. 1992) (applying *Chevron* deference to PBGC's interpretation of ERISA's statutory provisions).  Moreover, our Court of Appeals has held that such deference applies with equal force regardless of whether PBGC is acting in its guarantor role or its trustee role.  *Davis*, 571 F.3d at 1293.

Under *Chevron*, the Court must first determine "whether Congress has directly spoken to the question at issue," *Chevron,* 467 U.S. at 845—i.e., *Chevron* Step One.  If so, then the Court's inquiry ends, and the clear and ambiguous statutory language controls.  If not, then the analysis shifts to *Chevron* Step Two, whereby the Court must consider "whether the agency's [interpretation] is based on a permissible construction of the statute."  *Id.* at 843; *Page*, 968 F.2d at 1315 (framing the issue as whether "PBGC's interpretation of [the statute was] a reasonable one in view of the policies that underlie ERISA").  Here, since ERISA section 206(d)(3)(i) does not clearly define the phrase "any type or form of benefit, or any option, not otherwise provided under the plan"—and since neither side suggests that this language is clear and unambiguous—the Court proceeds to Step Two.

Applying this rubric, the Court concludes that PBGC's application of Section 206(d)(3)(i) to this case was based upon a reasonable and permissible interpretation of ERISA.  While Plaintiffs correctly argue (and PBGC rightly concedes) that the Texas DRO did not alter the amount or timing of the survivor benefit under the Plan, PBGC nevertheless determined that paying a survivor benefit based on the life of someone other than the beneficiary—i.e., paying

Gaylyn the benefit for the remainder of Melissa's life—was a form of benefit unavailable under the Plan.  As PBGC points out, the Plan does not define or contemplate such a benefit; it instead identifies the "normal" form of benefits for married participants as "an immediate annuity for the life of the [participant] with a survivor annuity for the life of the [participant's] spouse."  (AR 201 at ¶ 6.2).  Alternatively, participants could elect alternative "Optional Forms of Benefits," but none of those options contemplated a benefit payable to a beneficiary for the life of someone other than the beneficiary.  (AR 201 at ¶ 6.3).  Thus, under PBGC's interpretation, the DRO would have afforded a type of benefit "not otherwise provided under the plan," 29 U.S.C. § 1156(d)(3)(i), and therefore could not be qualified as a QDRO for purposes of ERISA.

Plaintiffs fail to mount any compelling argument that calls into question the reasonableness of PBGC's interpretation, particularly given their inability to identify any authority or precedent squarely addressing the precise issue presented here.  At best, Plaintiffs argue that courts have interpreted this subsection of ERISA to prohibit a DRO from being qualified as a DRO where it "would require benefits to be paid in a specific manner or time frame that is not provided for in the terms of the plan," such as where a DRO "requires the payment of benefits in a lump sum while the plan only permits payment over the course of several years," or "requires a plan to pay benefits before they are otherwise payable under the plan."  (Pls.' PBGC Reply at 3) (citing cases).  Maybe so.  But none of those cases undermines PBGC's interpretation that the change mandated by the DRO in this case—directing that surviving spouse benefits be paid for the lifetime of someone other than the beneficiary—also contravenes this aspect of ERISA.  The Court also agrees that the administrative anomalies presented by the DRO—e.g., the "need to monitor whether or not Melissa remains alive (even through PBGC is not paying her benefits) because PBGC's payments to Gaylyn would end upon

Melissa's death," (AR 12)—support the conclusion that PBGC's interpretation is a permissible construction of the statute and should be accorded deference under *Chevron* Step Two.

Thus, in view of PBGC's reasonable interpretation of ERISA section 206(d)(3)(i), and its reasoned application of this statutory provision to the issues presented in this case, Plaintiffs simply fail to establish that PBGC's decision was arbitrary or capricious.[11]

### 4.   PBGC's Determination As To The Common-Law Doctrine Of Waiver

As a final theory dispatched against PBGC, Plaintiffs contend that, separate and apart from the merits of the Appeals Board's analysis on the above-discussed issues, the common-law doctrine of waiver precludes PBGC from now arguing that the DRO cannot be qualified as a QDRO, or that Gaylyn should not otherwise be recognized as the proper survivor beneficiary under the Plan.  As Plaintiffs see it, because the former Plan administrator approved the Texas court's DRO as a valid QDRO and substituted Gaylyn as the beneficiary—even going so far as to draft the applicable language for the DRO in the first place—the Plan waived any arguments to the contrary.  (Pls.' Mem. at 23-24).  Inasmuch as PBGC simply steps into the shoes of the Plan administrator upon becoming statutory trustee of the Plan, Plaintiffs argue, this means that PBGC is equally bound by the effect of the Plan's purported waiver.

At the outset, there is no question that "Congress intended federal courts to fashion a federal common-law under ERISA," *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 495 (D.C.

---

[11]      Plaintiffs also pled an "anti-cutback" claim under 29 U.S.C. § 1054(g)(1) through Count II of their Second Amended Complaint, but it appears that they jettisoned this claim at the summary judgment stage.  Not only did Plaintiffs fail to affirmatively move for summary judgment on Count II in the opening brief, but they also completely failed to respond to PBGC's arguments seeking summary judgment on their "anti-cutback" claim.  (*See generally* Pls.' Mem., Pls.' PBGC Reply).  Consequently, the Court will deem this argument conceded and grant summary judgment in PBGC's favor on Count II of Plaintiffs' Second Amended Complaint as a result.  *See, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

Cir. 1998), but the D.C. Circuit has never decided whether this body of common law incorporates the principle of waiver.  In addition, as the parties' briefing makes clear, the Courts of Appeals that have addressed the issue are divided.  On one end of the spectrum, the Fifth Circuit has expressly and approvingly applied the doctrine of waiver in the ERISA context.  *See Pitts v. Am. Security Life Ins. Co.*, 931 F.2d 351, 356-57 (5th Cir. 1991).  The Fourth Circuit, by contrast, has held the opposite.  *See White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 29 (4th Cir. 1997) ("[T]he federal common law under ERISA . . . does not incorporate the principles of waiver and estoppel.").  And the Second, Seventh, and Eleventh Circuits have adopted a middle ground and recognize that, on a case-by-case basis, the doctrine of waiver might apply to the specific circumstances of a particular action.  *See Lauder v. First UNUM Life Ins. Co.*, 284 F.3d 375, 380-82 (2d Cir. 2002); *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 650 (7th Cir. 1993); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347-48 (11th Cir. 1994).  On balance, however, the Court need not wrestle with this thorny question to resolve Plaintiffs' waiver argument in this case.  Even assuming that our Court of Appeals would incorporate the principle of waiver as part of ERISA's common law, Plaintiffs fail to present any authority that would permit them to take the principle a step further by foisting a former plan administrator's purported waiver onto PBGC, as they strive to do here.

While Plaintiffs cite a number of cases that have applied the waiver doctrine in ERISA benefits cases, (*see* Pls.' Mem. at 20-22) (collecting cases), in none of those cases did a court apply the insurer's waiver against any party *other than the original plan insurer*.  *See Pitts*, 931 F.2d at 356-57 (applying waiver to preclude *insurer* from denying coverage under policy provision that required an insured group to consist of at least ten employees, where insurer collected premiums for five months after "learning beyond all doubt" that there was only one

employee remaining on the policy); *Lauder*, 284 F.3d at 380-82 (finding that *insurer* waived ability to assert defense to liability for long-term disability benefits where insurer "knew of [plaintiff's] claim for disability, chose not to investigate it, and chose not to challenge it"); *Rhorer v. Raytheon Eng'rs & Constructors*, 181 F.3d 634, 644-45 (5th Cir. 1999) (holding similarly and concluding that *insurer* waived ability to deny benefits coverage); *Burger v. Life Ins. Co. of N. Am.*, 103 F. Supp. 2d 1344, 1348-49 (N.D. Ga. 2000) (applying waiver against *insurer* seeking to recalculate benefit amounts after years of payment). *Cf. Loyola Univ. of Chi. v. Humana Ins. Co.*, 996 F.2d 895, 901-02 (7th Cir. 1993) (considering application of waiver doctrine against health *insurer*, but ultimately finding no waiver of insurer's right to require pre-approval of surgical procedure); *Glass*, 33 F.3d at 1341 (similar); *Thomason*, 9 F.3d at 648-50 (similar). In this case, however, Plaintiffs ask the Court to go beyond the bounds of those decisions, applying the Plan's purported waiver against PBGC acting as statutory trustee. In the Court's view, this is a significant distinction and would extend the doctrine a step too far.[12]

Through its statutory trusteeship role, PBGC is charged with unique and important objectives. Congress created PBGC, in part, "to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants," and "to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries." 29 U.S.C. § 1302(a)(1), (2); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843, 847 (2d Cir. 1984) ("One of Congress' central purposes in enacting ERISA was to prevent the great personal tragedy suffered by employees whose vested pension benefits were lost when plans were terminated."). Stated another way, "PBGC's purpose is to ensure that

---

[12]    While couched slightly differently, PBGC rightly draws this distinction in its brief. (*See* PBGC Mem. at 21) ("There simply is no authority supporting Plaintiffs' proposition that PBGC's ability to pay benefits under Title IV of ERISA is circumscribed by a former plan administrator's misinterpretations of ERISA.").

retirees receive pension benefits they have earned, even if their employer has terminated their pension plan or is otherwise unwilling or unable to pay." *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 512 F. Supp. 2d 32, 34-35 (D.D.C. 2007) (citing *Mead Corp.*, 490 U.S. at 717-18).  If PBGC were bound by erroneous benefits determinations made by plan administrators before it ever assumed statutory trusteeship responsibilities over a plan, this would frustrate Congress' intent and would impede PBGC's ability to exercise its fiduciary responsibilities in the interests of all of the plan's participants and the plan as a whole.  Indeed, as PBGC points out, upon becoming trustee of a terminated plan, PBGC assumes a wide range of fiduciary responsibilities, including the duty to rescind and remedy actions that violate ERISA.  *See Stephens v. US Airways Grp.*, 555 F. Supp. 2d 112, 119 (D.D.C. 2008), *rev'd in part on other grounds*, 644 F.3d 437 (D.C. Cir. 2011) ("[A] predecessor's breach that continues to have effect on beneficiaries during the term of a successor trustee must be remedied to the extent practicable under § 1105(a)(3)."); *Weisler v. Metal Polishers Union & Metal Prod. & Novelty Workers Union 8A-28A*, 533 F. Supp. 209, 215-16 (S.D.N.Y. 1982) ("29 U.S.C. § 1105(a)(3) requires the Trustees to examine and if necessary rescind prior actions if such actions violated provisions of ERISA.").[13]  Indeed, the Court notes that, on at least one occasion, the Supreme Court has declined to bind federal agencies to prior determinations and actions of private parties before the agency's involvement.  *See, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (finding that the EEOC was not bound by arbitration clause when bringing action in its own name, despite individual plaintiff's prior agreement to arbitrate disputes with employer).  The Court thus concludes that the Plan's purported waiver, if any, of the arguments discussed above cannot

---

[13]     Moreover, although not dispositive by any means, it bears noting that PBGC's Operating Policy Manual expressly contemplates that it may examine DROs that were qualified by prior plan administrators, to ensure compliance with ERISA.  (AR 52) ("PBGC may review QDROs that a prior plan administrator qualified before PBGC became trustee of a plan.").

operate to bind PBGC from ensuring that its administration of the Plan comports with ERISA's statutory mandates.[14]

### B. Plaintiffs' Claims Against Melissa VanderKam

Along with their challenges to the PBGC Appeals Board's decision, Plaintiffs alternatively seek relief against Melissa directly, asking the Court to impose a constructive trust under Texas common law. Specifically, Plaintiffs argue that, even if the Court upholds PBGC's determination, it should nevertheless issue a declaratory judgment directing that Melissa "will hold in trust and must transfer to John's successors any Survivor Benefit payments she received" from PBGC under the Plan, and that she "will owe John's successors fiduciary obligations in the handling of any Survivor Benefit payments." (Pls.' Mem. at 25-31). Melissa opposes Plaintiffs' request and seeks the dismissal of all of their claims under Texas common law (Counts III, IV, and V) on the grounds that these state law claims are preempted by ERISA. The Court agrees.

By its terms, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a); *see also Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 172 (D.C. Cir. 2011) ("ERISA sets out an interlocking, interrelated, and interdependent remedial scheme.") (internal citation and quotation omitted). The Supreme Court has "observed repeatedly that this broadly worded provision is clearly expansive." *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001) (internal citations and quotation marks omitted); *see also Moralez v. Trans World Airlines, Inc.*, 504 U.S. 374, 384

---

[14]     Given this holding, the Court does not have occasion to address the parties' arguments as to whether the Plan's purported waiver was a "knowing" waiver. Moreover, the Court reemphasizes that it expresses no opinion as to whether the Plan did, in fact, waive these arguments in the first place, or whether Plaintiffs could successfully marshal their waiver argument against the Plan directly.

     Relatedly, while Plaintiffs originally argued to the PBGC Appeals Board that the estoppel doctrine applied to their appeal, (AR 21-22, 350), they do not press any estoppel argument in this case and the Court therefore need not pass on the issue.

(1992) (collecting cases describing ERISA's broad preemptive reach). "Under this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)). Moreover, as explained by our Court of Appeals, "even general common law causes of action, such as breach of contract, which were not specifically intended to apply to benefit plans covered by ERISA, will nonetheless be preempted insofar [as] they affect ERISA-protected rights." *Bd. of Trustees of the Hotel & Rest. Employees Local 25 v. Madison Hotel, Inc.*, 97 F.3d 1479, 1486-87 (D.C. Cir. 1996).

Applying this framework, Melissa argues that "[t]he Texas state laws cited by the Plaintiffs should be preempted because the method by which a former spouse may secure an interest in plan benefits is provided under ERISA." (Dkt. No. 46-1 ("MV Mem.") at 15). She insists that Plaintiffs' common law claims are an effort to "contravene the plain and unambiguous plan terms that provide to whom QJSA benefits are paid upon John's death." (*Id.* at 17). For their part, Plaintiffs concede that ERISA preempts state laws and state-law claims relating to ERISA *plans*, but they argue that Congress did not intend such a sweeping preemptive effect over all aspects of plan *benefits*. (Dkt. No. 52 ("Pls.' MV Reply") at 3-4). Seizing on this distinction, Plaintiffs maintain that their claims against Melissa concern benefits, and do not implicate an employee benefit plan; they argue that the "central issue . . . is whether Melissa is entitled to retain the Survivor Benefits, not whether the Plan is required to pay them to her." (*Id.* at 4). If they prevail on their claims, Plaintiffs emphasize that "the constructive trust they seek would only come into play after the Plan follows its administrative scheme," and that nothing "would prevent the PBGC from acting in strict accordance with its preferred administrative

scheme." (*Id.* at 4-5). In turn, Plaintiffs contend that their state law claims against Melissa fall outside of ERISA's preemptive reach.

In support of this plan/benefits dichotomy, Plaintiffs rely on the Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne*, in which the Court held that "a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing" was not preempted by ERISA. 482 U.S. 1, 3 (1987). In *Fort Halifax*, the petitioner employer argued that, even though the payment was not encompassed by any plan covered by ERISA, the statute was preempted nevertheless simply because it "pertain[ed] to a type of employee benefit listed in ERISA." *Id.* at 7. Stated another way, the Court understood the petitioner's argument to be that "ERISA forecloses virtually all state legislation regarding employee benefits." *Id.* Unsurprisingly, the Court rejected this premise and, in so doing, used language upon which Plaintiffs now seize—that "ERISA's pre-emption provision does not refer to state laws relating to 'employee benefits,' but to state laws relating to 'employee benefit *plans*' . . . ." *Id.* (emphasis in original). But this principle, which Plaintiffs wrest out of context, is not as wide-reaching as they would suggest, and subsequent decisions from the Supreme Court have made clear that statutes interfering with the payment of benefits covered by an ERISA plan are frequently preempted under the statute. *See, e.g.*, *Boggs*, 520 U.S. at 835 (holding that ERISA preempts "a state law allowing a nonparticipant spouse to transfer by testamentary instrument an interest in undistributed *pension plan benefits*") (emphasis added); *Egelhoff*, 532 U.S. at 150 ("[T]he statute at issue here directly conflicts with ERISA's requirement that plans be administered, *and benefits be paid*, in accordance with plan documents . . . and is therefore pre-empted") (emphasis added).

Nonetheless, this case is a far cry from the circumstances confronting the Supreme Court in *Fort Halifax*. There is no dispute that the benefits Plaintiffs seek to recover through the requested constructive trust are benefits being paid out by PBGC pursuant to a plan covered by ERISA. Thus, unlike in *Fort Halifax*, the benefits at the center of the relief Plaintiffs seek indubitably "relate to [an] employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). Moreover, finding Plaintiffs' claims against Melissa preempted does not and could not have the impact of "foreclosing virtually all state legislation relating to employee benefits," *Fort Halifax*, 482 U.S. at 7, and any suggestion to the contrary strains credulity. Instead, Plaintiffs' state law claims are nothing more than an effort to make an end-run around ERISA's statutory prescriptions and the plain terms and requirements of the Plan. Through their constructive trust claims, Plaintiffs seek to achieve what they otherwise cannot accomplish under the statute itself—to divest Melissa of the survivor annuity benefit paid to her by PBGC under the terms of the Plan and to reassign that benefit to John and/or Gaylyn. This they cannot do. And, as Melissa rightly points out, other courts have rebuffed this approach before.

In *Carmona*, the Ninth Circuit soundly rejected the very same type of fallback argument that Plaintiffs present here, holding that "a state law constructive trust cannot be used to contravene the dictates of ERISA." 603 F.3d at 1061. In so holding, the court disagreed with the plaintiff's assertion that "a state law created constructive trust is too attenuated to fall within the mandatory preemption provision," and noted that the constructive trust was "explicitly an attempt to avoid ERISA's QDRO, preemption, and antialienation provisions." *Id.* at 1062. Consequently, the *Carmona* court concluded that:

> [A] . . . court cannot achieve through a constructive trust on the proceeds of a pension plan what . . . it cannot achieve through a QDRO. Any alternative rule would allow for an end-run around ERISA's rules and Congress's policy

> objective of providing for certain beneficiaries, thereby greatly weakening, if not entirely abrogating, ERISA's broad preemption provision.

*Id.* at 1061. Other courts have reached the same conclusion. In *Melton v. Melton*, the Seventh Circuit held that a state law constructive trust claim was preempted by ERISA. 324 F.3d at 944-45. And in circumstances very similar to those in the case at bar, the Fourth Circuit rejected an attempt by a participant's spouse to impose a constructive trust over benefits paid from an ERISA-governed plan. *See Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d 857, 863-64 (4th Cir. 1997). In deeming the claim preempted, the *Pettit* court explained that:

> [The] constructive trust claim, which is based upon a property settlement agreement, if allowed to stand, would directly conflict with ERISA's goal of providing a nationally uniform plan administration and reduce the QDRO provisions to a meaningless footnote in the preemption context. Undoubtedly, this claim would also reduce the certainty of plan administration and increase litigation, along with the associated costs that Congress sought to decrease. There could hardly be a more striking example of a state claim hindering the full accomplishment of congressional objectives. Because the claim interferes with Congress's clear objectives and conflicts with the plain language of ERISA, it must fall victim to the ERISA preemption provision.

*Id.* at 864; *see also Metropolitan Life Ins. Co. v. Cline*, 388 F. App'x 690, 692 (9th Cir. 2010) ("The imposition of a constructive trust simply cannot be used to circumvent ERISA preemption except in the limited circumstances when a valid QDRO exists.").[15] While the D.C. Circuit has

---

[15] On April 26, 2013, Plaintiffs filed a Notice of Supplemental Authority (Dkt. No. 62), proffering two additional decisions they deem supportive of their claims: *US Airways, Inc. v. McCutchen*, --- U.S. ---, 133 S. Ct. 1537 (2013), and *Andochick v. Byrd*, 709 F.3d 296 (4th Cir. 2013). In the Court's view, however, neither of these cases lends any considerable strength to Plaintiffs' position. First, in *McCutchen*, the Supreme Court held that equitable defenses cannot override the terms of an ERISA plan, but went on to explain that where a plan is "silent on the allocation of attorney's fees . . . the common-fund doctrine provides the appropriate default." *Id.* at 1548-49. The Court fails to glean how Plaintiffs perceive the *McCutchen* decision as relevant to this case, let alone beneficial to their cause. The Fourth Circuit's decision in *Andochick* provides somewhat of a closer analogue, but a crucial distinction remains: the court held that "ERISA does not preempt post-distribution suits against ERISA beneficiaries." 709 F.3d at 300-01 (expressly distinguishing claims to "*undistributed* plan benefits") (emphasis in original). By contrast, the tug-of-war over the survivor benefits in this case obviously involves as-yet undistributed benefits and thus implicates different considerations. Moreover, were the Court to

not addressed this issue, this Court adopts the reasoning espoused by the Fourth, Seventh, and Ninth Circuits in these decisions.  Because Plaintiffs' claims for a constructive trust under Texas state law would circumvent the carefully-crafted statutory scheme implemented by Congress through ERISA, those claims are preempted and cannot stand.[16]

Finally, the Court finds unavailing Plaintiffs' arguments that the doctrines of *res judicata* and collateral estoppel "bar[] Melissa from re-litigating the issue of whether the Survivor Benefits were awarded to John as part of the divorce" and that "she never intended to waive her interest in the Survivor Benefit."  (Pls.' Mem. at 28 n.10).[17]  In effect, Plaintiffs argue that the divorce decree and the DRO entered by the Texas state court constitute final judgments that bind Melissa on the waiver issue.  But this theory essentially just repackages Plaintiffs' earlier arguments and claims—both with respect to the decision of the PBGC Appeals Board, and also with respect to  Plaintiffs' alternative state law claims—and the Court rejects those arguments for the reasons stated.  Plaintiffs cannot simply tee up these issues with a slightly different label and expect a different result.

---

interpret *Andochick* in the manner Plaintiffs seem to suggest, it would run headlong into the Fourth Circuit's decision in *Pettit*, which was decided on facts much closer to those presented here.  *See* 164 F.3d at 865 ("We believe Congress made itself clear on this point—unless a domestic relations settlement complies with the QDRO requirements, ERISA preempts its enforcement through a state law mechanism such as a constructive trust.").  Thus, the supplemental authorities filed by Plaintiffs ultimately do not impact the resolution of this case.

[16]      This ruling plainly applies to Counts III and IV of Plaintiffs' Second Amended Complaint, which seek a declaratory judgment imposing a constructive trust against Melissa, and a constructive trust to remedy Melissa's alleged unjust enrichment, respectively.  Plaintiffs also pled a claim against Melissa for anticipatory breach of contract through Count V, but they failed to brief or otherwise mention that claim whatsoever in their summary judgment papers.   While their breach of contract claim under Texas law would not survive the Court's preemption analysis either, the Court finds that Plaintiffs also abandoned this claim by failing to raise it during cross-briefing.  *See, e.g., Ctr. for Biological Diversity v. Blank*, --- F. Supp. 2d ----, 2013 WL 1248288, at *2 n. 5 (D.D.C. Mar. 28, 2013); *Hainey v. U.S. Dep't of Interior*, --- F. Supp. 2d. ----, 2013 WL 659090, at *8 n.8 (D.D.C. Feb. 25, 2013).

[17]      Indeed, there may be some significance to the fact that these arguments were relegated to a few sentences in a footnote in Plaintiffs' opening brief.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Plaintiffs' Motion for Summary Judgment is **DENIED**, and that PBGC's Cross-Motion for Summary Judgment and Melissa Vanderkam's Cross-Motion for Summary Judgment are both **GRANTED**.  An appropriate Order accompanies this Memorandum Opinion.

Date:  May 7, 2013

_____
ROBERT L. WILKINS
United States District Judge